Filed 10/29/15  P. v. Zamora CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066282 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN320636) |
| JASON JAMES ZAMORA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert J. Kearney, Judge.  Affirmed.

Charles M. Sevilla for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

This assault case arose out of a bar brawl at Belly Up Tavern (Belly Up) in Solana Beach.  A jury found Jason James Zamora guilty of three counts of assault with a deadly

weapon (counts 1-3: Pen. Code,[1] § 245, subd. (a)(l); victims: Francisco Diaz, Gary Brooks, and Ryan Ricketts, respectively). As to counts 1 and 2, the jury found to be true an allegation that Zamora personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)). As to each of the three counts, the jury also found to be true an allegation that Zamora personally used a deadly weapon (a knife) (§1192.7, subd. (c)(23)). At the sentencing hearing, the court suspended imposition of sentence and placed Zamora on three years' probation.

Zamora raises four principal contentions on appeal. First, he contends the court prejudicially erred by giving CALCRIM No. 3471, which concerns the right to self-defense. Second, he contends the court prejudicially erred by giving CALCRIM No. 3472 because it "misstates the law of self-defense in circumstances where a defendant may only intend to provoke a non-deadly encounter but then finds himself confronted with lethal force." Third, he asserts the court prejudicially erred by failing to excise from CALCRIM No. 875 that part of the instruction that told the jury that voluntary intoxication is not a defense to assault. Last, he contends the court prejudicially erred when it excluded proposed testimony of the defense expert, Dr. Thomas Streed—that hospital photographs of Zamora showed petechial hemorrhages associated with choking—on the ground Dr. Streed was not qualified. We affirm the judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

2

FACTUAL BACKGROUND

A. *The People's Case*

On June 20, 2013,[2] Zamora, his wife, Amy Zamora, and a group of their friends went to the Belly Up to listen to a band play music. When they arrived, they went up the stairs to find their seats in the loft above the stage. Francisco Diaz, a security guard, noticed that Zamora's wife was stumbling and appeared to be intoxicated. Diaz radioed Gary Brooks, the loft security guard, and asked him to keep an eye on her.

Brooks testified that Zamora's wife was "slurring" her words and was "clearly drunk" when she reached the top of the stairs, and she did not have her loft ticket. Brooks told the group she was intoxicated, she had had enough to drink, and they should take care of her. He then told them they could enter the loft.

Zamora responded by accusing Brooks of being unprofessional. Brooks replied that he had already been radioed that Zamora's wife was drunk, and he (Brooks) could see that she was drunk and was stumbling when she came up the stairs. Zamora's group then walked back downstairs to a smoking area behind the stage. One woman in the group approached Diaz and complained about Brooks. Diaz said positive things about Brooks and tried to calm her down.

Brooks testified that when the group returned to the loft Zamora approached him with tickets in his left hand, got "very close"—about two inches from his face—and

_____

[2]     All further dates are to calendar year 2013.

3

shoved him in the chest with his forearm. Repeatedly pushing the tickets against Brooks's chest, Zamora said, "Is this what you want? Is this what you want?"

Brooks responded by pushing Zamora away and warning him, "Don't ever get in my face again like that." Brooks also told Zamora, "If you put your hands on me again, watch what the fuck happens to you." Brooks testified he was upset with Zamora and indicated he could have him asked him to leave, but he did not want to kick out the entire group.

Michelle Prato-Scott, the group's cocktail waitress, noticed that Zamora and his wife were very angry. Prato-Scott told Zamora and his wife several times that Brooks was just doing his job, but they remained angry with Brooks.

Prato-Scott testified Zamora's group was "pretty loud," which prompted complaints from other customers. Two different customers complained to Prato-Scott, and Brooks also received a couple of complaints. Prato-Scott testified that Zamora's group could be heard above the band and that "[e]ven downstairs, you could hear them."

Brooks approached Zamora's group, calmly told them the show was almost over, and asked them to quiet down. The group became "very combative" and wanted to know which customers had complained. Brooks testified that they eventually "agreed that they were going to be cool," and he then went back to his post.

Prato-Scott testified that Zamora "said something racial" about Brooks,[3] which upset her, so she told Zamora's group that it was fine if they wanted to complain to

---

[3]     Brooks is African-American.

management about the security guard, but they did not need to "get racial or angry." She also told them that, if they wanted to stay, they had to calm down. Zamora's friends indicated to her they would calm him down because they wanted to stay.

Blueray Curtiss, a customer in the loft that night, testified that the people in Zamora's group were "drinking heavily" throughout the course of the evening and appeared to be intoxicated, and they were "kind of loud and boisterous" during the show and "progressively got louder." Curtiss asked the security guard (Brooks) to tell Zamora's group to be quiet because he (Curtiss) and his wife could not hear the show.

After he received this new complaint, Brooks again told Zamora's group to keep the noise down. Brooks testified that the group became "very upset" with him and told him they were leaving.

Curtiss testified that, when Brooks approached Zamora's group, several people in the group, who were "obviously upset about [Brooks's] confronting them," stood up and approached Brooks within about eight inches of his face in an aggressive and threatening manner; and Brooks, in a "threatened position," pushed back the person directly in front of him and stepped back at the same time.

Brooks testified that when Zamora got up to leave, and while maintaining eye contact with Brooks, Zamora swept a glass off of a table and said, "Oops." The glass fell and Brooks saw it break. Zamora then broke another glass and it appeared he was going to break some more glasses. Brooks radioed the other security guards that they needed to remove the group.

5

Brooks grabbed Zamora's shoulders and told him, "Don't break another glass." Brooks heard other members of Zamora's group breaking more glasses and glass rained down on the tables below the loft.

Brooks testified that by the time the other security people came up to the loft the incident had turned into a fight. According to Brooks, Zamora pushed him because he had his hands on Zamora's shoulders, and Brooks pushed him back. Zamora's friend, Dino Dobbins, got close to Brooks's face with a glass in his hand and pushed Brooks away. Brooks testified that he then "engaged" Dobbins, who threw either the contents of his glass or the entire glass at him. Dobbins tried to punch Brooks, but missed, and Brooks punched him in the nose. Zamora ended up on the ground.

The security personnel escorted Zamora's group downstairs. The Belly Up's manager, Steve Roder, testified that on the way down the stairwell Zamora threw a punch at Brooks, who was standing next to Roder. Zamora missed, but nearly struck Roder, who leaned back and flinched. Zamora, his wife, and Dobbins struggled and resisted as they were escorted out of the building.

At the exit of the Belly Up, Roder, who was holding Zamora, told him and the others in Zamora's group that he would call the police if they did not leave. Roder testified that Zamora then tried to knee him in the groin. Roder pushed Zamora against a pole and told him he was going to go to jail if did not calm down.

According to Roder, Zamora then attempted to knee him in the groin again, and Zamora's friend (Dobbins) hit Roder from the side. Roder, who was knocked to the ground, lost his grip on Zamora, and ended up next to the exit door.

6

Regarding the fight that broke out when Zamora tried to knee Roder in the groin, Brooks testified that Zamora was swinging at the security personnel, who were trying to grab Zamora's arms to get him under control. Brooks also testified that "we were trading punches. [Zamora] was punching at us and we were punching him back and trying to grab him at the same time." Brooks then grabbed Zamora. Brooks testified that, although he had received training in the Marine Corps on how to apply a carotid restraint hold, he did not use the hold on Zamora because when he (Brooks) was hired, he was told he was not allowed to choke people.

Ricketts testified that he jumped on Zamora's back and "put [his] arms around [Zamora's] head and neck area" as they were falling. He had Zamora in a "headlock," but he did not put his hands around Zamora's neck. Ricketts lost and then regained his hold. Brooks took Zamora down against a bench and then Diaz rolled them off the bench and onto the ground.

Prato-Scott testified that the security guards told Zamora to stop fighting but he "kept fighting" and they "had a really hard time holding him down." Security managed to control Dobbins on the ground.

Meanwhile, Prato-Scott was trying to calm down Zamora's wife, who was jumping on the security guards' backs and trying to punch them. Other members of Zamora's group also tried to hold back Zamora's wife.

Brooks testified that, within seconds after Zamora was down on the ground, he (Brooks) felt "pressure inside of [his] leg" and thought Zamora was "pricking [him] with a pen or something." Brooks pulled Zamora's right wrist away from Brooks's thigh and

7

then realized that Zamora had used a knife to stab him high up on his thigh. Brooks pulled the serrated knife out by pulling Zamora's hand away from his leg. Brooks then loudly said, "This motherfucker['s] got a knife!" It took about 10 more seconds to get Zamora handcuffed after Brooks got the knife out of Zamora's right hand because Zamora, who was lying on his belly and still struggling, held his left hand underneath his body.

After it was over, Diaz and Ricketts noticed that they also had been stabbed. Zamora stabbed Diaz in his left leg below the knee. Diaz suffered two cuts, one five inches long and the other about three inches long. Both were two inches deep.

Brooks suffered a one-inch-long by one-inch-deep stab wound in his right thigh that required four staples at the hospital. Ricketts had a stab wound in his left leg that required several stitches.

A police officer who arrived shortly after the incident described Zamora's group as animated and intoxicated. The group did not provide any details about the incident, and they yelled at the police officers.

B. *The Defense*

Zamora and six members of his group testified for the defense, as did a use-of-force expert (Thomas Streed) whose proffered testimony on whether Zamora suffered petechial hemorrhages associated with choking (discussed, *post*) was excluded prior to trial.

Michael Gollhofer was the first member of Zamora's group who testified. Gollhoffer testified that Zamora and his wife drank in moderation during dinner before

8

they went to the Belly Up. They went upstairs to the loft when they arrived at the Belly Up. The security guard was rude to Zamora's wife when she was unable to find her ticket stub, and she became upset. Gollhoffer did not see Zamora's wife stumbling on the stairs and she did not seem overly intoxicated.

While at the Belly Up, Gollhofer bought two rounds of drinks, one round of three drinks and one of four drinks. During the show, a waitress told the group they were a little too loud because the band was playing an acoustic song. Then a male manager came up to them and told them to "keep it down." Someone in the group said, "We understand. We're about to leave right now."

Gollhoffer also testified that, when they got up to leave, he heard a beer bottle or a pint glass fall on the floor and break, which made a loud noise, and the African-American guard (Brooks) "rushed over and tackled" Zamora. Gollhoffer testified that another member of the group, Dobbins, "leaned down to try to either pick [Zamora] up or get the bouncer off of him," and another bouncer ran up and punched Dobbins in the nose. Gollhofer tried to separate them as best he could while saying, "We were trying to leave. All we want to do is leave. Please let us get out of here."

Other bouncers came up the stairs and then they all proceeded in single file down the stairs with Zamora and Brooks exchanging words. Gollhoffer testified that at the exit "all of us were basically pushed and shoved out the door" to the sidewalk in front of the Belly Up.

When he exited, Gollhoffer saw a bouncer with a headlock on Dobbins. Gollhoffer saw three other bouncers "alternating with each other, kicking [Zamora] and

9

pushing [his] head into the ground." Zamora was facedown on the ground. A couple of the bouncers were kneeing Zamora's back while another in front was repeatedly pushing his head into the sidewalk. Gollhofer testified that he was trying to reason with the bouncers and get them to stop, when he heard a bouncer say, "He's got a knife."

Dobbins's wife, Maricela Ramirez-Dobbins, testified that Zamora's wife was "a little disturbed" at the Belly Up because the bouncer at the top of the stairs was rude to her when he told her in no uncertain terms that she needed to pull herself together and find her ticket. Dobbins's wife went to that bouncer (Brooks) and told him they were there to have a good time and not to cause trouble. She found him to be a "little rude" and "not so friendly." She testified she drank water at the Belly Up as did Zamora's wife. She also testified that, when a member of the staff asked that Zamora's group to try to keep down their noise level, "we figured it would be a good time to [go home]."

Dobbins's wife also testified that as they were standing up to leave all of a sudden things became chaotic and then they were "tumbling . . . as a group, down the stairs and out of the Belly Up." She noticed her husband's nose was "gushing blood," and there was pushing and shoving. As they exited the Belly Up, a bouncer had her husband in a "bear hug" from behind, trying to restrain him. She looked over and saw Zamora facedown on the ground with a few bouncers on top of him and restraining him. One had his knee in Zamora's back and they were punching him. She heard someone shout something about a knife.

Dobbins testified that he and Zamora each had three pints of beer and five or six shots of sake at the restaurant where they and the rest of Zamora's group had dinner

10

before they went to the Belly Up.  When they arrived at the Belly Up, Dobbins and his wife went to the bar and got some drinks.  After the group went to their seats in the loft, Brooks came over and told them they were too loud.  Dobbins had earlier complained to another bouncer about Brooks and how rude and unprofessional he was.

Before the concert ended, Brooks approached Zamora's group and Dobbins saw pushing and shoving.  Dobbins got up from his seat and tried to separate Zamora and Brooks.  Dobbins testified that, as soon as he stepped in, he was "sucker-punched, directly into the face, by [Brooks]."  Dobbins denied that he had attempted to throw a punch.  Another bouncer put him in a chokehold, ushered him down the stairs, and dragged him to the door.  Once they were outside, the bouncer took him to the ground and told him to calm down, and another one came and sat on him to hold him down.  Dobbins testified he saw Zamora "on his stomach, with his hands by his side, being beaten by three bouncers."  One had "his hands around his [Zamora's] throat, pulling back on him."  Shortly thereafter, Dobbins heard someone say, "He's got a knife."

Kathryn Sullivan, another member of Zamora's group, testified that she walked to the Belly Up with Zamora's wife, who was not walking in a manner out of the ordinary. Sullivan was drunk when she arrived at the Belly Up because she had drunk three pints of beer and five small cups of sake, and her memory of events on the night of the incident was not clear.  She remembered other members of the group saying it was time to leave, and when she got outside she saw Belly Up security pushing Zamora out the door.  She witnessed the security people kicking and hitting Zamora, who was on his back on the ground.

11

Amanda Soto, another member of Zamora's group, testified she also attended the dinner and the Belly Up show on June 20. (7RT 827:12, 828:13-21, 829:1-8)! She, too, felt the influence of alcohol as she walked to the Belly Up. Before she went up to the loft, she went to the bar and ordered another drink. She testified that when Zamora's wife was looking for her ticket at the top of the stairs the security guard (Brooks) sternly told her to "watch her consumption" as she was looking for her ticket. Soto testified that she went back downstairs and complained to another security person "about the other bouncer being very aggressive and hostile towards us." That other bouncer later came up to her during the performance, slapped her on the back, and, in a manner that was a bit abrupt, said, "You guys have to keep it down."

Soto testified that when everyone decided it was time to go she got up and heard raised voices and a glass breaking on the floor. Then she saw Dobbins's nose and face covered in blood. Everyone was rushed, and even pushed, down the stairs. She saw Zamora outside on the ground with several security people on top of him. Zamora was lying on his chest, immobile, with his arms behind him.

Zamora's wife testified she had two or three beers and two or three cups of sake at the restaurant before she and the others walked to the Belly Up. She testified she that, although she felt the effects of the alcohol, she had no problems walking to the Belly Up, and she did not feel intoxicated or unsteady.

Zamora's wife also testified that, when the group climbed the stairs to the loft, they met Brooks, who said to her, "I was radioed from downstairs about you. You were stumbling and falling over, . . . watch out." His tone was abrasive and rude. She was

12

upset by her interaction with Brooks. When she went downstairs to look for her ticket and talk to someone about her concerns, she asked two of the staff if they had radioed upstairs about her stumbling, and they said no. She then went upstairs to enjoy the show. She did not drink alcohol at the Belly Up.

Zamora's wife testified that the others in Zamora's group were lively and in good spirits, but they probably were being a little loud. Someone in the group told the others to quiet down. After about an hour and a half, they decided to leave. Zamora's wife testified that she saw a beer glass fall off a railing. She then saw Brooks take Zamora to the ground. Shortly thereafter she saw Dobbins's bloody nose. Zamora's group was then hustled down the stairs and out of the building.

When she got outside, Zamora's wife saw that Zamora was on the ground on his chest. Four security guards were on top of him kicking and punching him, and pinning him down. She tried to pull them off Zamora to get them to stop, but she was pushed away and fell on her back.

Zamora also testified. He had owned the pocket knife at issue in this case for seven years. At the dinner on June 20, he had two to four glasses of beer and three to four small cups of sake. He and the others in his group were at the restaurant for at least one and a half hours.

At the Belly Up, Zamora and the others walked up to the loft. His wife was not intoxicated and he did not see her stumbling up the stairs. Zamora testified that as they approached the top of the stairs he saw his wife going through her purse and he heard Brooks "ma[k]e a comment, with a very harsh and unprofessional tone." Brooks said

13

something to the effect that, "I've been warned about you stumbling. You need to watch what you drink."

The group walked back down the stairs and Zamora's wife got her ticket for the loft. Zamora testified that they indicated to the bouncer at the door that the upstairs bouncer (Brooks) had "an attitude problem" and was "not being professional." The response was that they had heard such comments about the upstairs bouncer in the past.

Zamora testified that the group went back up to the loft. At the top of the stairs, Zamora "just held the tickets up" to Brooks and the group "walked right by him." When asked about Brooks's testimony that he (Zamora) had pushed the tickets against Brooks's chest, Zamora testified that he had never made physical contact with Brooks. He "cruised right by" Brooks and there was no confrontation at that point.

Brooks later told Zamora's group to keep the noise down. Zamora testified that he replied, "Seriously?" or something to that effect. Brooks did not react and walked away.

Shortly thereafter Zamora's group collectively decided to leave and some were standing up. Zamora was standing, about to step down a riser to leave the elevated reserved area in the loft. Zamora testified that Brooks approached him and said, "I've already warned you guys. I'm going to kick you out if I have to say something else." Zamora replied, "What's your problem? You've been giving us a hard time all night." Brooks responded, "Say something else and see what the fuck happens to you."

Zamora testified he then took a step backward and his beer glass, which was on the handrail, accidentally fell to the floor. Zamora acknowledged in his testimony that he

14

had something to do with his beer glass falling. He also acknowledged that, when he did that, he was making eye contact with Brooks.

Zamora testified that Brooks then "just pounced on [him]" and pushed him flat on his back. He also testified that he never attempted to knee anyone in the groin inside or outside the Belly Up.

Dobbins came over and Zamora saw Brooks punch Dobbins in the face. The security people then dragged Zamora backwards down the stairs and out the exit door.

Outside the Belly Up, Zamora was taken to the ground and he rolled over onto his stomach. He was being kicked and kneed, and his face was pushed into the cement sidewalk. He felt a very sharp pressure on his lower right back and an arm go around his neck, and he could not breathe. Zamora testified he started to black out and he thought he was going to die.

Zamora also testified that, while lying facedown on the sidewalk, he pulled out his pocket knife with his right hand and "flicked" it open with his wrist after pressing on the thumb stud to release the blade. He then swung the knife back and forth in a swiping motion until the blade hit something and he could breathe again. Zamora testified he did not intend to inflict the injuries he inflicted with the knife.

After he used the knife, Zamora heard someone say, "He's got a knife." Someone grabbed his wrist, took the knife out of his hand, and put his arm behind his back.

On cross-examination the prosecutor, referring to Zamora's medical records, asked him, "[W]hen you saw your primary [physician], you didn't tell him you had been choked at all, did you?" Zamora did not recall telling the physician he had been choked.

15

Dr. Streed, who has a Ph.D. in applied psychology, testified for the defense as an expert witness. He opined that the bar-arm chokehold, in which an arm is squeezed back while pressed against the front of another person's throat, is a very risky hold because it cuts off oxygen to the brain and can cause the person to suffocate. An untrained person using the bar-arm chokehold is potentially using deadly force. A person upon whom the hold is used might panic and grab something nearby to use as a weapon.

DISCUSSION

I. <em>CALCRIM NO. 3471</em>

Zamora first contends on five different grounds that the court prejudicially erred by giving CALCRIM No. 3471. We reject this contention.

A. *Background*

The court instructed the jury on self-defense under CALCRIM Nos. 3470, 3471, and 3472. These instructions address when a defendant may lawfully use force in self-defense (CALCRIM No. 3470), circumstances when self-defense is available to a mutual combatant or an initial aggressor (CALCRIM No. 3471), and the legal principle that a plea of self-defense may not be contrived (CALCRIM No. 3472).

The prosecutor requested the instruction under CALCRIM No. 3471, arguing that "this jury instruction is the only means by which [Zamora] can justify under the law the use of a knife against people who are attacking him." Zamora's counsel objected, arguing that the facts did not support the giving of that instruction because there was no evidence of mutual combat or that Zamora was an initial aggressor. Defense counsel also objected

16

to CALCRIM No. 3471 on the ground it would "confuse the jury with having to decide all of these other extra elements [of self-defense]."

The court overruled the defense objections, finding that "there is substantial evidence to support that [Zamora] *started the altercation every step of the way*. [¶] There is substantial evidence to support that he started the fight outside by trying to knee the manager [(Roder)] in the groin, starting the physical confrontation. [¶] There is substantial evidence to support that[,] by doing that, [*Zamora*] *was agreeing to engage in mutual combat, and the individuals from the Belly Up, by voluntarily joining into the fracas, have also agreed to enter into mutual combat*." (Italics added.)

The court gave the jury the following version of the 2013 revised CALCRIM No. 3471:

> "3471. Right to Self-Defense: Mutual Combat Or *Initial Aggressor*
>
> "A person who engages in *mutual combat* or who *starts a fight* has a right to self-defense only if:
>
> "1. He actually and in good faith tried to stop fighting;
>
> "2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting;
>
> "AND
>
> "3. In the case of mutual combat, he gave his opponent a chance to stop fighting.
>
> "If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight.
>
> "However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the

17

defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.

"A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose." (First two italics added.)

B. *Analysis*

1. *Sufficiency of the evidence*

Zamora first contends the court prejudicially erred in giving CALCRIM No. 3471 because there was no substantial evidence to support a finding that Zamora and the three Belly Up employees he stabbed had a mutual intent to fight. In support of this contention, Zamora asserts the court "focused only on prosecution evidence indicative of [Zamora's] willingness to fight." Zamora further asserts that, "even assuming [he] engaged in acts showing an intent to fight, there was no evidence that Brooks, Ricketts, or Diaz intended or consented to fight [him]," because "[t]heir position was they were just trying to subdue [him] to get him out of the Belly Up and/or hold him for the police." We reject Zamora's contention and related assertions.

a. *Legal principles*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) "In reviewing a claim of instructional error, the ultimate question is whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.'" (*People v. Hajek*

18

*and Vo* (2014) 58 Cal.4th 1144, 1220.) "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*Ibid.*) We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [trier of fact's] verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

b. *Analysis*

Zamora misconstrues the record in asserting that the court "focused only on prosecution evidence indicative of [Zamora's] willingness to fight." The court specifically found that substantial evidence showed not only that Zamora's acts of trying

to knee the Belly Up's manager, Roder, in the groin demonstrated Zamora's agreement to engage in mutual combat, but also showed that "*the individuals from the Belly Up*, by voluntarily joining into the fracas, ha[d] *also agreed to enter into mutual combat*." (Italics added.) Thus, contrary to Zamora's unsupported assertion, the court considered evidence indicating both Zamora's *and* the Belly Up employees' willingness and intent to engage in the fight that began with Zamora's attempt to knee Roder in the groin outside the Belly Up.

Zamora's insufficiency-of-the-evidence claim is also unavailing because the prosecution presented substantial evidence from which a reasonable jury could find both that Zamora *started the fight* that took place outside the Belly Up, and that, by their conduct, he and the Belly Up employees he stabbed impliedly agreed to engage in mutual combat within the meaning of CALCRIM No. 3471. The Attorney General argues the prosecution presented evidence that, when the security guards escorted Zamora outside the Belly Up, Roder told Zamora and his group to leave and Zamora responded by kneeing him in the groin, thereby starting the fight that ensued. Indeed, Roder testified that Zamora tried to knee him in the groin while he was holding Zamora and escorting him out of the building. According to Roder, Zamora then attempted to knee him in the groin again.

Zamora asserts, however, that "Roder's testimony is not 'substantial evidence' to support the instruction" (CALCRIM No. 3471) because his testimony was "unworthy of credibility" and, thus, "[t]here was no credible evidence [he (Zamora)] was the initial aggressor." In support of his suggestion that we reevaluate Zamora's credibility, Zamora

20

points out that on cross-examination defense counsel showed Roder a transcript of a recorded statement Roder made to the police that night at the Belly Up regarding the incident, in which Roder answered, "Correct," when he was asked, "So the guy that kneed you took off?" At trial Zamora's counsel asked Roder, "Is that what you said?" Roder replied, "Yeah, I said that."

Zamora's suggestion that we reweigh Roder's credibility is improper. We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Thus, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury*, *supra*, 30 Cal.4th at p. 403.) Zamora's request that we reevaluate Roder's credibility violates these well-established principles governing application of the substantial evidence standard of review.

Without a citation to the record, in violation of rule 8.204(a)(1)(C) of the California Rules of Court,[4] Zamora attempts to support his claim that Roder was "unworthy of credibility" by asserting that Roder, in his recorded statement to the police, "stated that he was kneed *by an unknown person* who took off." (Italics added.) Nothing

---

4     Under rule 8.204(a)(1)(C) of the California Rules of Court, Zamora is required to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." "[I]t is [a litigant's] duty to point out portions of the record that support the position taken on appeal." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 (*Del Real*).)

21

in the reporter's transcript of Roder's testimony on cross-examination supports Zamora's assertion that Roder stated to the police that the person who kneed him and took off was "an unknown person."

Zamora improperly ignores Roder's testimony on redirect examination which supports a reasonable inference that Zamora was the person who kneed Roder and temporarily "took off." The following exchange took place between the prosecutor and Roder:

> "[Prosecutor:] "And *when you said* [*to the detectives*] *that the guy who kicked you in the groin or kneed you in the groin, he took off* -- do you remember saying that? You aren't 100 percent sure that you said that, but you assume from the transcript that you did?
>
> "[Roder:] Yes.
>
> "[Prosecutor:] And *after the person tried to kick you in the groin twice, he did disappear from your view*; correct?
>
> "[Roder:] That's true.
>
> "[Prosecutor:] And you didn't see him until after he was down on the ground and the stabbing had already happened.
>
> "[Roder:] That's right." (Italics added.)

Viewing Roder's foregoing testimony in the light most favorable to the judgment, as we must (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578), we conclude his testimony supports a reasonable inference that, after Zamora tried to kick Roder in the groin, Zamora "disappear[ed]" from Roder's view and Roder did not see Zamora again until after Zamora was on the ground and the stabbings had occurred.

22

Zamora improperly disregards other substantial evidence from which a reasonable jury could find that Zamora started the fight by trying to knee Roder and then continued to fight when the Belly Up's employees tried to get him under control. Brooks testified he was standing behind Roder just inside the exit and, as Zamora's group was exiting the building, "[a]ll of a sudden, [Zamora] turn[ed] and knee[d] [Roder] in his groin region." Brooks also testified that, when Zamora tried to knee Roder in the groin, Roder "tri[ed] to grab [Zamora] and hold him down, and then *a fight broke out*." (Italics added.) Diaz similarly testified "[i]t appeared that [Zamora] had kneed my manager in the groin," and "[a]t that point hands were on" and *a fight broke out between Zamora and Roder*. The Belly Up's audiovisual technician, Ricketts, testified that Zamora "kind of clenched [Roder], just reached and grabbed his shirt, and went for a knee to his groin area or lower area." Brooks further testified that "we were trading punches. [Zamora] was punching at us and we were punching him back and trying to grab him at the same time."

As Zamora has "fail[ed] to present us with all the relevant evidence, [and has] fail[ed] to present that evidence in the light most favorable to the People, . . . he cannot carry his burden of showing the evidence was insufficient because support for the [trier of fact's] verdict may lie in the evidence he ignores." (*People v. Sanghera, supra,* 139 Cal.App.4th at p. 1574.) We are "not required to search the record on [our] own seeking error." (*Del Real*, *supra*, 95 Cal.App.4th at p. 768.)

Zamora's reliance on *People v. Ross* (2007) 155 Cal.App.4th 1033 (*Ross*), is misplaced. *Ross* addressed the concept of mutual combat as the term applied to the right of self-defense. In that case the defendant and a woman engaged in a hostile verbal

23

exchange, at the culmination of which she slapped him, and the defendant responded with a blow that fractured her cheekbone. (*Id.* at p. 1036.) A jury convicted the defendant aggravated assault and battery after the trial court (1) instructed the jury, over defense objection, that a person charged with assault cannot successfully plead self-defense if he was engaged in mutual combat with the alleged victim; and (2) refused the deliberating jurors' request for a legal definition of "mutual combat," and told them to rely on the ordinary meaning of those words. (*Id.* at pp. 1036, 1042-1043.) The *Ross* court stated that "'mutual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied *agreement* to fight." (*Id.* at pp. 1046-1047.) The Court of Appeal also explained that the mutual combat instruction is inapplicable unless there is "evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id.* at p. 1047.)

Although the *Ross* court found the trial court erred in giving the mutual combat instruction absent substantial evidence, it was the trial court's failure to clarify the definition of "mutual combat" on inquiry by the jury that constituted prejudicial error. (*Ross*, *supra*, 155 Cal.App.4th at pp. 1049, 1054-1056.) The Court of Appeal reasoned that, "[h]ad the jury been properly instructed on the meaning of 'mutual combat,' and were the record otherwise silent on the subject, [the instruction might be harmless]. A properly instructed jury would not find 'mutual combat' on the present facts, and would therefore presumably ignore the instruction. But the jury here was *not* properly

24

instructed. It was left to suppose that the instruction might apply to *any* exchange of blows." (*Id*. at p. 1056.)

Here, unlike in *Ross*, the trial court instructed the jury on the meaning of mutual combat. Specifically, the court gave the portion of CALCRIM No. 3471 that states: "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

Furthermore, unlike the instruction at issue in *Ross* which dealt solely with the right to self-defense of a person engaged in mutual combat (*Ross*, *supra*, 155 Cal.App.4th at p. 1043, fn. 9), CALCRIM No. 3471 applies to both mutual combatants and persons who start a fight. Thus, here, the trial court properly gave CALCRIM No. 3471 instruction as the jury reasonably could have concluded that Zamora started the fight outside the Belly Up.

For all of the foregoing reasons, we conclude that substantial evidence supported the giving of CALCRIM No. 3471.

2. *The phrases "initial aggressor" and "starts a fight" in CALCRIM No. 3471*

Zamora also claims the phrases "initial aggressor" and "starts a fight" in CALCRIM No. 3471 were inapplicable and vague because the court did not define those phrases, and the jury could have found he started the fight based on evidence that did not meet the legal definition required for such a finding. We reject this claim.

The Attorney General argues that Zamora forfeited appellate review of this claim because he did not request that the court clarify CALCRIM No. 3471 concerning the

25

meaning of those phrases. Although Zamora does not dispute that he failed to request such clarification, we elect to reach the merits of the claim.

The California Supreme Court has explained that when a word or phrase "'"is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request."'" (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*Ibid.*)

Here, the phrase "starts a fight" is a phrase that is commonly understood by those familiar with the English language and is not used in CALCRIM No. 3471 in a technical sense peculiar to the law. Thus, we conclude the court had no duty to sua sponte give the jury a clarifying instruction as to its meaning. The phrase "initial aggressor" appears only in the heading of CALCRIM No. 3471, but a fair reading of that instruction shows that it and the phrase "starts a fight" are used interchangeably and, thus, "initial aggressor" is defined in CALCRIM No. 3471 by the commonly understood phrase "starts a fight." We conclude Zamora's claim fails on the merits.

3. *Unanimity*

Zamora next contends the court erred by failing to give an instruction requiring that the jury be unanimous in finding the facts that would nullify the right of self-defense under CALCRIM No. 3471. He asserts, for example, that "[i]f half the jurors thought [he] was the 'initial aggressor' and half thought he engaged in 'mutual combat,' they have not agreed that the prosecution met its burden to defeat self-defense."

26

In response, the Attorney General asserts that Zamora is "attempt[ing] to graft juror unanimity for separate criminal acts, each of which would give rise to separately charged counts, onto a situation where it does not apply." Noting that the prosecution charged Zamora with the commission of three assault offenses, one for each stabbing victim, the Attorney General further asserts that "[w]hether and when [Zamora] initiated the fight or engaged in mutual combat had nothing to do with the separate instances of criminal conduct charged for each stabbing."

We conclude Zamora's contention is unavailing because the unanimity requirement is inapplicable. The California Supreme Court has explained that, "[i]n a criminal case, a jury verdict must be unanimous" and "[a]dditionally, the jury must agree unanimously the defendant is guilty of a *specific crime*." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*), second italics added.) "This requirement of unanimity as to the *criminal act* 'is intended to eliminate the danger that the defendant will be convicted even though there is no single *offense* which all the jurors agree the defendant committed.'" (*Ibid*., quoting *People v. Sutherland* (1993) 17 Cal.App.4th 602, 612, italics added.) *Russo* further explained that the unanimity requirement pertains to crimes, as shown by the purpose of that requirement:

> "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a '*particular crime*' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But *unanimity as to exactly how the crime was committed is not required*. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete

27

criminal event.' [Citation.] *In deciding whether to give the instruction, the trial court must ask whether* (1) *there is a risk the jury may divide on two discrete crimes and not agree on any particular crime*, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at pp. 1134-1135, italics added.)

Here, the unanimity requirement does not apply because whether, when, or how Zamora initiated the fight or engaged in mutual combat within the meaning of CALCRIM No. 3471, although relevant to the issue of whether he had a right to self-defense under CALCRIM No. 3471, had nothing to do with whether the jury unanimously agreed he committed each of the three charged *specific* assaults. There was no risk that the jury could have "divide[d] on . . . discrete crimes and not agree[d] on any particular crime" (*Russo*, *supra*, 25 Cal.4th at p. 1135). "[U]nanimity as to exactly how the crime was committed is not required." (*Ibid*.) Zamora's claim of instructional error fails because it focuses on acts related to self-defense that preceded his acts of stabbing the victims that resulted in the criminal charges Zamora challenges in this appeal.

4. *Aggressor's withdrawal in the face of sudden and deadly force*

Zamora next contends that CALCRIM No. 3471 misstates the law of self-defense "by adding a duty to withdraw from a fight." We reject this contention.

As noted, CALCRIM No. 3471 addresses the circumstances under which self-defense is available to a defendant who was a mutual combatant or an initial aggressor. Zamora challenges the portion of CALCRIM No. 3471 given by the court that stated:

"However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the

28

defendant *could not withdraw from the fight*, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."  (Italics added.)

Zamora asserts that this portion of CALCRIM No. 3471 "distorts the right to self-defense because it requires more of [him] than the law requires."  Specifically, he claims that CALCRIM No. 3471 "misstates the law to [his prejudice] because, under its terms, he had no right to self-defense when the opponent used deadly force (here, the 'guillotine' choking) unless he could first prove he couldn't withdraw from the fight."  Zamora maintains he "did not have to show he could not retreat or withdraw as he was being kicked in the head and choked by three persons while prone on the ground."  In support of his claim, Zamora relies on the California Supreme Court's statement in *People v. Hecker* (1895) 109 Cal. 451, 464 (*Hecker*) that "one may always defend himself against a criminal attempt to take his life."

The Attorney General responds that CALCRIM No. 3471 "nearly verbatim tracks a well-established and valid rule of law" set forth in *Hecker*, and therefore the challenged portion of CALCRIM No. 3471 is legally accurate.

We conclude that CALCRIM No. 3471 is legally accurate, and we quote the relevant language in *Hecker* to show why Zamora's reliance on that case is misplaced:

> "Where one is the first wrongdoer, but his unlawful act is not felonious, as a simple assault upon the person of another, or a mere trespass upon his property, even though forcible, and this unlawful act is met by a counter assault of a deadly character, the right of self-defense to the first wrongdoer is not lost.  For, as his acts did not justify upon the part of the other the use of deadly means for their prevention, his killing by the other would be criminal, and one may

29

always defend himself against a criminal attempt to take his life. But in contemplation of the weakness and passions of men, and of the provocation, which, though inadequate, was wrongfully put upon the other, it is the duty of the first wrongdoer before he can avail himself of the plea to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed his adversary, under necessity, actual or apparent, only after so doing. *If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense*." (*Hecker*, *supra*, 109 Cal. at p. 464, italics added.)

*Hecker* essentially holds that when an initial aggressor uses nonlethal force, he or she must withdraw before using lethal force in self-defense unless the opponent responds with force "so sudden and perilous" that the initial aggressor "cannot retreat with safety." (*Hecker*, *supra*, 109 Cal. at p. 464.) Accordingly, we conclude that CALCRIM No. 3471 embodies the rule stated in *Hecker*, which is valid (see *People v. Quach* (2004) 116 Cal.App.4th 294, 301-302), and therefore is legally accurate.

5. *Burden of proof*

Zamora also contends that CALCRIM No. 3471 impermissibly shifted to the defense the People's burden regarding the defense of self-defense because it "[t]he instruction is worded in terms of [his] proving facts to regain his right of self-defense," and thus it "place[d] the burden on the defense to prove his right to self-defense." We reject this contention.

Viewing the instructions as a whole, as we must (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1220), we conclude there is no reasonable likelihood the jury would have assigned to the defense the burden of proving Zamora had no legal right to self-defense.

30

Zamora acknowledges that CALCRIM No. 3471 is silent on the issue of which party carried the burden of proof. The record shows the court instructed the jury elsewhere that Zamora did not have the burden of proving he acted in lawful self-defense, and the People were required to prove the assaults were not justified. For example, the court instructed the jury under CALCRIM No. 3470 that "[t]he People have the burden of proving beyond a reasonable doubt that [Zamora] did not act in lawful self-defense," and that, "[i]f the People have not met this burden, you must find [him] not guilty of Counts One, Two, and Three . . . ." The court instructed the jury under CALCRIM No. 875, the standard jury instruction on assault with a deadly weapon, which similarly stated, "To prove that [Zamora] is guilty of this crime, the People must prove that: [¶] . . . [¶] 5. [he] did not act in self-defense." The court also gave the jury CALCRIM No. 220, the standard instruction on reasonable doubt, which reiterated that the People were required to "prove[] their case beyond a reasonable doubt."

As the version of CALCRIM No. 3471 that the court gave to the jury properly stated the law, and in light of the foregoing instructions (CALCRIM Nos. 3470, 875, 220), we conclude the jury would have understood that the People had the burden of proving beyond a reasonable doubt that Zamora did not act in lawful self-defense.

## II. *INSTRUCTION ON CONTRIVED SELF-DEFENSE*

Zamora next contends the court prejudicially erred by giving CALCRIM No. 3472, the standard jury instruction on contrived self-defense, because it "misstates the law of self-defense in circumstances where a defendant may only intend to provoke a

31

non-deadly encounter but then finds himself confronted with lethal force." This contention is unavailing.

A. *CALCRIM No. 3472*

Without a defense objection, the court instructed the jury with CALCRIM No. 3472, which states:

> "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

B. *Analysis*

In claiming the court prejudicially erred by instructing the jury with CALCRIM No. 3472, Zamora primarily relies on the recent majority decision in *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*).

In *Ramirez* the evidence established that the two codefendants had provoked a fistfight with rival gang members. (*Ramirez*, *supra*, 233 Cal.App.4th at p. 944.) One of the defendants testified that during the fight a rival gang member pulled out what appeared to be a gun, so he pulled out his own gun and shot the rival gang member. (*Id*. at p. 945.) The trial court instructed the jury with CALCRIM Nos. 3471[5] and 3472.

---

[5] *Ramirez* explains that CALCRIM No. 3471 "describe[es] an initial aggressor or mutual combatant's revived right of self-defense if an opponent in a nondeadly confrontation suddenly resorts to deadly force." (*Ramirez*, *supra*, 233 Cal.App.4th at p. 948.) As discussed, *ante*, CALCRIM No. 3471 states in part: "[*I*]*f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force* and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting." (Italics added.)

(*Ramirez*, at pp. 946, 948.) During closing arguments, the prosecutor repeatedly misstated the law of self-defense by arguing, based on the language of CALCRIM No. 3472, that even if the jury believed the defendants sought to provoke only a fistfight, their intent to use force—even nondeadly fisticuffs—meant they forfeited any claim of self-defense. (*Ramirez*, at pp. 943, 945-946.) The jury found both codefendants guilty of first degree murder. (*Id*. at p. 943.)

On appeal the *Ramirez* defendants contended the trial court erroneously preventing the jury from considering their claims of self-defense by instructing the jury under CALCRIM No. 3472 that "'[a] person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force.'" (*Ramirez*, *supra*, 233 Cal.App.4th at p. 943.)

Agreeing with the defendants, the majority in *Ramirez* reversed the judgment, holding that "CALCRIM No. 3472 *under the facts before the jury* did not accurately state governing law." (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 947, 953, italics added.) The prosecutor's repeated misstatement about the law of self-defense was a substantial factor in the decision. Noting that the prosecutor "repeatedly emphasized, under CALCRIM No. 3472's command, 'it doesn't matter' whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions" (*Ramirez*, at p. 950), the *Ramirez* majority explained that, "[i]n essence, the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (*Id*. at p. 953.) The *Ramirez* majority also concluded that, on the facts presented to the jury, the

33

prosecutor's repeated "forceful argument" misstating the law of self-defense, in conjunction with the language of CALCRIM No. 3472, misled the jury regarding the law of self-defense. (*Ramirez*, at p. 952.)

Zamora's reliance on *Ramirez* is misplaced. First, *Ramirez* acknowledged that CALCRIM No. 3472 "states a correct rule of law in appropriate circumstances" (*Ramirez, supra,* 233 Cal.App.4th at p. 947), and thus, for example, "a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance." (*Ibid*.) Here, as already discussed, the jury was properly instructed under CALCRIM No. 3471 that "if [Zamora] used only non-deadly force, and the opponent[s] responded with such sudden and deadly force that [he] could not withdraw from the fight, then [he] had the right to defend himself with deadly force . . . ."

Second, *Ramirez* is distinguishable. In that case, in which the victim pulled out a gun to finish the fistfight that the defendants intended to provoke, the prosecutor repeatedly misstated the law of self-defense and misled the jury by arguing, based on the language of CALCRIM No. 3472, that even if the jury believed the defendants sought to provoke only a fistfight, their intent to use force meant they forfeited any claim of self-defense. (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 943, 945-946.) The *Ramirez* prosecutor repeatedly emphasized that it did not matter whether, under CALCRIM No. 3471, the victim "escalated a nondeadly conflict to deadly proportions." (*Ramirez*, at p. 950.)

34

Here, in contrast, the prosecutor engaged in no such conduct and, thus, did not mislead the jury.  As Zamora points out, the prosecutor did argue to the jury that self-defense "cannot be contrived, and an individual cannot claim self-defense when they started the fight."  Citing CALCRIM No. 3472, the prosecutor added that "the law reflects that."  Zamora disregards, however, the fact that the prosecutor in this case then immediately clarified the law of self-defense by telling the jury:  "Now, the law does take into account the fact that even if you start a fistfight, it doesn't mean that someone can take out a gun and shoot you in the chest, even if you started the fight."  The prosecutor explained to the jury that a person who "uses a knife during a fistfight" is "guilty of assault with a deadly weapon" because the force used is unreasonable.  The prosecutor later reiterated that "[y]ou cannot slash and stab at individuals with a knife during a fistfight."

Here, like the trial court in *Ramirez*, the court gave CALCRIM No. 3471, which properly stated the principle that if the defendant starts a fight with nonlethal force, and the victim suddenly escalates by using deadly force, the defendant has the right to use deadly force in self-defense.  Unlike the prosecutor in *Ramirez*, the prosecutor did not tell the jury it did not matter whether, under CALCRIM No. 3471, the victims escalated a nondeadly conflict to deadly proportions.  (See *Ramirez*, *supra*, 233 Cal.App.4th at p. 950.)  We presume the jurors understood and followed the court's instructions under CALCRIM No. 3471 (see *People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption.

35

For all of the foregoing reasons, we conclude Zamora has failed to meet his burden of demonstrating the court committed prejudicial error by instructing the jury under CALCRIM No. 3472.

### III. *CALCRIM NO. 875*

Zamora also claims the court prejudicially erred by failing to excise from CALCRIM No. 875, the standard jury instruction on assault with a deadly weapon, the portion of the instruction that told the jury voluntary intoxication is not a defense to assault. This claim is unavailing.

#### A. *Background*

Zamora was charged with three counts of assault with a deadly weapon. At the jury instruction conference, the court made a number of changes to CALCRIM No. 875 and asked defense counsel and the prosecutor whether they were satisfied with the modified instruction. They indicated they were satisfied. Zamora's counsel did not object.

The court gave the modified version of CALCRIM No. 875, which advised the jury that "[v]oluntary intoxication is not a defense to assault."

During closing argument, the prosecutor told the jury:

> "The alcohol, the shoving, the fists and the knees, all of this chaos spilling out of the bar onto the street only really mattered in this case when Jason Zamora started to lose. He lost control. He got pinned down. And he didn't like it. Angry. According to deputies that were there, *intoxicated*.
>
> "So how does that figure into this case?

36

"Well, we have to prove . . . that it wasn't lawful self-defense. . . .   It always is governed by reasonableness.  And when you are talking about the use of deadly force, he has to reasonably believe that he was in imminent danger.  And that belief must be honestly held. . . .

"But in this case, no reasonable person would act the same way. *There is no angry, drunk-person standard in the law*.  His behavior has to match the standard of what a reasonable person would have done under the circumstances, not if someone was *drunk* or angry or been in a fight.  [¶] *Voluntary intoxication.  No defense to that*." (Italics added.)

The prosecutor continued his lengthy argument that Zamora had not acted in lawful self-defense and then told the jury:

"[W]hen you analyze all the facts and the circumstances in this case and compare it with the witnesses' testimony, certainly beyond a reasonable doubt, . . . the People have proved that [Zamora] acted well beyond anything remotely resembling self-defense. [¶] . . . [¶] . . . [D]*on't leave your common sense and everyday life experience here in the jury seat. . . .   You just apply the facts to the law and use your everyday life experience, and you will see . . .* [t]*here is no legitimate self-defense here*.  You cannot slash and stab at individuals with a knife during a fistfight."  (Italics added.)

Following his conviction of all three assault counts, Zamora brought a motion for new trial in which he claimed the court erred in giving this portion of CALCRIM No. 875 because it "essentially nullified the self-defense instruction."  The court denied Zamora's new trial motion.

B.  *Analysis*

Zamora contends the court's instruction that "[v]oluntary intoxication is not a defense to assault" was error because "the instruction could have nullified jury consideration of self-defense if the jury first found intoxication."  He asserts that,

37

"[b]ecause the court instructed the jury that voluntary intoxication is not a defense to assault, it is highly likely, in light of the prosecutor's emphasis on intoxication, the jury construed the instruction to mean it need not consider self-defense to the assault charges if it found voluntary intoxication." He further asserts that "[t]he instruction on voluntary intoxication and the prosecutor's urging that there was intoxication took the jury's focus off self-defense."

The Attorney General responds that Zamora forfeited his claim by failing to object in the trial court to the challenged portion of CALCRIM No. 875 that the court gave to the jury. Alternatively, the Attorney General argues that Zamora's claim is "wholly speculative that the jury might have failed to consider self-defense," and any error was harmless.

In the exercise of this court's discretion, we elect to reach the merits of Zamora's claim of instructional error. (See *People v. Chaney* (2007) 148 Cal.App.4th 772, 780 ["we choose to address the issue on its merits even though it was waived by failure to specifically object"].)

We conclude Zamora has failed to meet his burden of demonstrating prejudicial error because his claim is speculative. Our review of the reporter's transcript of the prosecutor's closing arguments belies Zamora's unsupported assertions that "[t]he instruction on voluntary intoxication and the prosecutor's urging that there was intoxication took the jury's focus off self-defense," and that "it is highly likely . . . the jury construed the instruction to mean it need not consider self-defense to the assault charges if it found voluntary intoxication." The prosecutor's closing arguments focused

38

primarily on the prosecution's claim that Zamora did not act in lawful self-defense when he stabbed the three victims in this case. The prosecutor urged the jurors to "analyze all the facts and the circumstances in this case and compare it with the witnesses' testimony," and told them, "[D]on't leave your common sense and everyday life experience here in the jury seat." The prosecutor also told the jurors that, by "apply[ing] the facts to the law and us[ing] [their] everyday life experience," they would "see . . . [t]here is no legitimate self-defense here." Zamora's claim of prejudicial instructional error is unsupported.

## IV.  *EXCLUSION OF EXPERT TESTIMONY*

Last, Zamora contends the court prejudicially erred when it excluded proposed opinion testimony of the defense's expert, Dr. Thomas Streed. We reject this contention.

### A.  *Background*

Prior to trial, the defense sought to call Dr. Streed to testify as an expert that Zamora, after the incident, suffered from petechial hemorrhage in his eye that was associated with choking. The prosecution objected on the ground Dr. Streed was not qualified to give such testimony because he was not a medical doctor. The court stated, "If he doesn't have a medical background, I'm inclined to sustain the People's objection."

A hearing was held under Evidence Code section 402 regarding Dr. Streed's credentials, experience and opinions. Dr. Streed testified he has a Ph.D. in human behavior. For 25 years he was employed by the San Diego County Sheriff's Department, and during 21 of those years he was assigned to the homicide division. He is licensed in the State of California to instruct in areas of police science and for 10 years he was a defensive tactics instructor for the San Diego County Sheriff's Department. He taught at

39

various universities and taught a homicide course at San Jose State University that included officer-involved use-of-force investigations. He was trained in the use of neck holds and had taught standard police sleeper holds for police agencies for many years. Another type of hold known as the bar-arm chokehold cuts off oxygen through the windpipe and causes an individual ultimately to pass out as a consequence of anoxia, which is lack of oxygen to the brain. He testified that this hold is "highly objectionable to most police agencies [he had] consulted with because of the risk factors."

Regarding his experience with petechial hemorrhages, Dr. Streed testified he had seen it "repeatedly" during the time he spent with the sheriff's department homicide division. He stated that petechial hemorrhages are "consistent more frequently than not with some kind of anoxia," and they are "consistent with the small blood vessels in the eyes rupturing." He had been present during autopsies when the forensic pathologist had pointed out petechial hemorrhages.

Dr. Streed also testified that in this case he had examined the police reports, the preliminary hearing transcript, and some photographs taken of Zamora. He testified he is not a medical doctor, and he "never ha[d] said, 'This is petechial hemorrhage.'"

On cross-examination, Dr. Streed acknowledged he had reviewed the medical report of the doctor who saw Zamora after the incident. Dr. Streed acknowledged the medical report concluded that Zamora had a black eye, and he stated he did not disagree with the report.

The court ruled that Dr. Streed lacked the background, training, and experience to give an opinion on whether Zamora suffered petechial hemorrhages. Specifically, the court stated:

> "[W]ith regards to the injuries in the eye and the bloodshot portions of the whites of [Zamora's] eyes, if as stated by Mr. Streed, that a doctor couldn't say what it is or isn't, I am not going to allow him to speculate what he thinks it is or is not. I don't think he has the medical background, training, and experience to come in and differentiate or describe what that is."

B. *Applicable Legal Principles*

Expert opinion testimony may be admissible if it relates to a subject matter beyond common experience and would assist the trier of fact. (Evid. Code, § 801, subd. (a); *People v. Torres* (1995) 33 Cal.App.4th 37, 45.)

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (*Ibid*.)

"[W]hether a person qualifies as an expert in a particular case depends upon the facts of that case and the witness' qualifications." (*People v. Kelly* (1976) 17 Cal.3d 24, 39.) "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*Ibid*.)

41

C. *Analysis*

In support of his claim of evidentiary error, and quoting a Bob Dylan song,[6] Zamora asserts that, "[j]ust as 'you don't need a weatherman to know which way the wind blows [citation],' one doesn't require a medical doctor to give the opinion proffered by Dr. Streed. His experience alone justified his testimony." He maintains Dr. Streed qualified as an expert because had seen the eyes of many people who have been choked, he is "familiar with the research into the area describing petechial hemorrhaging," and the jury should have been allowed to determine the weight of his opinion testimony.

We conclude Zamora has failed to meet his burden of demonstrating the court abused its broad discretion by excluding Dr. Streed's proffered opinion testimony on the ground it would be impermissibly speculative because he lacked the medical background, training, and experience to give an expert opinion on whether what the court referred to as the "bloodshot portions" of the whites of Zamora's eyes were petechial hemorrhages associated with choking. Dr. Streed stated he is not a medical doctor, and he acknowledged the medical report of the doctor who saw Zamora after the incident concluded that Zamora had a black eye. On cross-examination the prosecutor asked Dr. Streed, "And you disagree with his diagnosis or you say it's also consistent with petechial hemorrhaging?" Dr. Streed replied, "I don't disagree with him at all." Later, the prosecutor asked him, "So you don't know whether it is petechial hemorrhaging from the

_____

6      "Subterranean Homesick Blues."

42

strangulation or he got popped in the eye?" Dr. Streed answered, "Neither do the physicians."

Dr. Streed's foregoing testimony supports the court's finding that his proffered opinion testimony would be speculative because he lacked the medical background, training, and experience to qualify as an expert on this subject. The court did not err in excluding this portion of Dr. Streed's proffered testimony.

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.